**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| THOMAS STALCUP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil No. |
| v. | ) | 11-11250-FDS |
| | ) | |
| CENTRAL INTELLIGENCE AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is an action arising out of a request for public access to government documents containing information about the crash of TWA Flight 800 in 1996. Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, plaintiff has requested several documents relating to the CIA's involvement in the investigation of the crash. Although the agency has turned over a number of documents, it has withheld certain documents and portions of documents as exempt from disclosure under FOIA. Plaintiff challenges the agency's characterization of the documents as exempt from FOIA, and seeks their release.

Defendant has moved for summary judgment. For the following reasons, its motion will be granted.

**I.   Background**

   **A.   Factual Background**

On July 17, 1996, at approximately 8:30 p.m., TWA Flight 800 exploded in mid-air and crashed into the ocean eight miles south of Long Island, New York, killing all 230 people on

board.  The National Transportation Safety Board ("NTSB") immediately began an investigation into the cause of the crash.  The agency enlisted help from several other governmental entities, including the FBI and the CIA.  The agency's initial investigations focused on three possible causes:  a bomb, a missile, or a mechanical failure.

Because of the possibility that the explosion was caused by either a bomb or a missile, the FBI launched a criminal investigation into the incident.  As part of that effort, FBI investigators spoke with 244 eyewitnesses about their observations of the crash, and documented the interviews.  Many of the eyewitnesses reported seeing a streak of light rising up toward the plane prior to the explosion.  Because those reports suggested that the explosion might have been caused by a missile launched as an act of terrorism, the FBI requested assistance from the CIA.

Specifically, the CIA was tasked with analyzing the eyewitness accounts to determine whether their observations would support a theory that the crash was caused by a missile.  After reviewing the reports, the CIA concluded that the eyewitnesses had not observed a missile striking the plane, but rather the aircraft itself in various stages of the explosion and crash.  The agency created a video entitled "TWA Flight 800:  What Did the Eyewitnesses See?"  The video, which aired on CNN in November 2007, depicted an explosion that separated the forward section of the plane from the remainder of the plane.  Once the forward section came detached, the video depicted the plane ascending quickly before suffering a second, larger explosion, and ultimately breaking apart and falling into the ocean.  The narrator stated that the plane's trajectory as it ascended "may have looked like a missile attacking an aircraft."

The investigation was "by far the most expensive and the most extensive in the history of the [NTSB]." *Lahr v. NTSB*, 569 F.3d 964, 969 (9th Cir. 2009).  The NTSB ultimately

concluded that the crash was most likely caused by an explosion in a fuel tank in the aircraft's center wing.

### B. Procedural Background

On March 31, 2010, Thomas Stalcup sent a letter to the CIA requesting "copies of all data, images, video, documents and/or other information related to or a product of the CIA's involvement in the TWA Flight 800 Investigation." He also requested three specific items or types of items:

> (1) "an electronic copy of the CIA's March 1997 'Technical Analysis Briefing: TWA Flight 800'";
>
> (2) "all eyewitness documents, reports, videos, images, and/or audio provided to the CIA by the FBI and/or any other entity . . . for CIA's analysis of the TWA Flight 800 eyewitness evidence"; and
>
> (3) "any and all correspondence (email, letter, fax, memo, etc.) regarding the CIA's . . . analysis of the eyewitness evidence."

On May 28, 2010, the CIA responded to Stalcup's FOIA request. In its response, the agency indicated that it had received an earlier FOIA request on the same subject as Stalcup's. As a result, the agency addressed Stalcup's request by searching its database to determine what documents it had previously released in response to the earlier inquiry. The agency then provided him with 25 previously-released documents, consisting of 234 pages in total.

On June 17, 2010, Stalcup challenged the adequacy of the agency's response. He stated that "the three items listed . . . were specific requests that I made that were in addition to [the more general request], and not limited to those three items." He included several specific requests for additional information.

On July 15, 2011, Stalcup filed a complaint in this Court against the CIA. He challenged

the agency's decision to withhold certain requested documents as unsupported by the exemptions.

On May 30, 2012, the CIA provided Stalcup with additional responsive records. Those records included 49 documents that were released in their entirety, 89 documents that were redacted in part pursuant to FOIA exemptions, and one DVD. The agency also indicated that it had located additional documents through coordination with other agencies, and that those documents would be provided as soon as the other agencies had completed their review. On October 24, 2012, the CIA provided 14 additional documents to Stalcup, following review by other agencies.

On May 15, 2013, the CIA moved for summary judgment.

## II.   Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotations omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). In evaluating a summary judgment motion, the Court indulges all reasonable inferences in favor of the non-moving party. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts

showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id*. at 256-57.

### III.   Analysis

As a threshold matter, the Court begins by emphasizing what this case is *not* about. It is not about whether the crash of TWA Flight 800 was caused by an explosion in the plane's fuel tank or by a proximity-fused missile. It is not about what eyewitnesses reported seeing when that crash took place. Nor is it a case in which this Court must determine whether plaintiff is correct in his belief that a pervasive and protracted government conspiracy resulted in the public being provided with a false explanation of the crash. Rather, it is simply a dispute arising from plaintiff's request for information under FOIA, and defendant's determination that certain information was exempt from the disclosure requirements of FOIA, and thus may be properly withheld under the statute.

#### A.   Statutory Framework

FOIA was enacted "to facilitate public access to [g]overnment documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). The statute sets forth a basic policy in favor of full agency disclosure, "reflecting the notion that 'promoting an informed citizenry . . . is vital to democracy.'" *Moffat v. U.S. Dep't of Justice*, 716 F.3d 244, 250 (1st Cir. 2013) (quoting *Carpenter v. U.S. Dep't of Justice*, 470 F.3d 434, 437 (1st Cir. 2006). It "serves to expose the operations of federal agencies 'to the light of public scrutiny.'" *Id*. (quoting *Department of the Air Force v. Rose,* 425 U.S. 352, 361 (1976). Thus, a government agency must generally

respond to a FOIA request by making any requested materials in the possession of the agency available to any person who requests them. *Carpenter*, 470 F.3d at 438.

Nevertheless, the statute provides nine categories of exemptions under which the government may withhold requested documents or portions of documents. *Id*. The nine FOIA exemptions are to be construed narrowly, and any doubts are to be resolved in favor of disclosure. *Id*. The government bears the burden of proving that withheld materials fall within an exemption. 5 U.S.C. § 552(a)(4)(B).

Defendants in this case focus on three of the nine exemptions: exemption 5 (deliberative process information), exemption 6 (personal privacy information), and exemption 7(c) (law enforcement information).

### B. Plaintiff's FOIA Requests

Plaintiff seeks the production of two additional documents, as well as portions of certain other documents that were produced in redacted form, all of which defendant contends are exempt from FOIA disclosure. First, plaintiff seeks an unredacted, 17-page document entitled "Analysis of Radar Tracking" that defendant has withheld pursuant to exemption 5. Second, plaintiff seeks an unredacted, 18-page document entitled "Dynamic Flight Simulation" that defendant has also withheld pursuant to exemption 5. Third, plaintiff seeks the names of eyewitnesses who were interviewed by the FBI in the days and weeks following the crash of Flight 800. Defendant has withheld identifying information about these individuals pursuant to exemptions 6 and 7(c).

#### 1. Documents Withheld Pursuant to Exemption 5

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums [sic] or

letters which would not be available by law to a party other than an agency in litigation with the agency." *State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 66 (1st Cir. 2002). The exemption protects from disclosure any documents that would normally be privileged from civil discovery. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). In other words, the protection incorporates doctrines that would limit the scope of discovery, including the attorney-client privilege, the work-product protection, and the deliberative-process privilege.

The exemption is intended to protect the "decision[-]making processes of government agencies." *Id.* at 150 (quoting *Tennessean Newspapers, Inc. v. FHA*, 464 F.2d 657, 660 (6th Cir. 1972)). To invoke the exemption, an agency must prove that the document at issue was (1) "prepared prior to a final decision in order to assist an agency decisionmaker in arriving at his decision," and (2) "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Town of Norfolk v. United States Army Corps of Eng'rs*, 968 F.2d 1438, 1458 (1st Cir. 1992) (internal quotations omitted).

Defendant has withheld two documents pursuant to exemption 5. It contends that the documents are protected by the exemption because both are pre-decisional drafts that include recommendations or opinions on legal or policy matters.

Plaintiff challenges the exemptions' applicability for two reasons. First, he contends that because he has presented evidence of government misconduct, defendant may not invoke exemption 5. Second, he contends that the exemption does not apply because the documents at issue were not "pre-decisional."

        **a.**     **<u>Government Misconduct Exception</u>**

Plaintiff first contends that the government may not invoke exemption 5 in a case

involving allegations of fraud or governmental misconduct. He bases this contention on the First Circuit's statement in *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995) that "where the documents sought may shed light on alleged government malfeasance, the [deliberative process] privilege is routinely denied." *See also In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) ("[W]here there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government."). Plaintiff thus argues that this Court "must [] apply the First Circuit's clear holding in [*Texaco*] that the deliberative process privilege under Exemption 5 cannot apply based on blatant fraud and malfeasance by the CIA in its analysis of the Flight 800 crash." (Pl. Br. at 20).

Plaintiff significantly overstates the applicability of *Texaco*. In that case, the court addressed the deliberative process privilege in the context of civil discovery, not in the context of a FOIA suit. Neither that case, nor any of the other cases cited by plaintiff, stands for the proposition that the government-misconduct exception to the deliberative-process privilege is available in FOIA cases.

Several courts in the District of Columbia have, however, determined that the government-misconduct exception may, in some circumstances, be invoked in the context of FOIA. *See National Whistleblower Center v. Department of Health and Human Services*, 903 F. Supp. 2d 59, 66-68 (D.D.C. 2012) (collecting cases). Those courts have nonetheless highlighted the "need to apply the exception narrowly." *Id.* at 69. They have held that a party asserting the government-misconduct exception must "provide an adequate basis for believing that [the

documents] would shed light upon government misconduct." *Id*. at 67 (quoting *Judicial Watch of Florida v. U.S. Dept. of Justice*, 102 F. Supp. 2d 6, 15 (D.D.C. 2000).

In this case, plaintiff is alleging significant and prolonged governmental misconduct, in the form of a vast conspiracy to hide the truth from the public about the cause of the crash of Flight 800. Specifically, he asserts that the CIA, in concert with the NTSB and FBI, perpetrated a fraud on the public by conducting an inaccurate and untruthful investigation concerning the cause of the crash. He has set forth lengthy descriptions of the evidence that he contends supports his theory. He has not, however, provided any basis for his assertion that the specific documents at issue would shed light on the alleged governmental misconduct. He has not provided his rationale for believing that these documents, in particular, might aid him in shedding light on the alleged misconduct—either by including data that would refute the government explanation or revealing internal communications about that explanation, or for any other reason. Both documents significantly post-date the point at which plaintiff contends a decision was made to mislead the public by preparing the allegedly erroneous video "TWA Flight 800: What Did the Eyewitnesses See." If there is a reason the subsequent documents should be disclosed, plaintiff has not provided it. Indeed, plaintiff does not even *mention* the requested documents in his brief, let alone make his case for why they would "shed light on [] government malfeasance." *Texaco Puerto Rico Inc.*, 60 F.3d at 885. While plaintiff obviously cannot describe the contents of a document he has not seen, he must nonetheless, at a minimum, provide some reasonable basis for asserting that the documents are relevant to the alleged government misconduct.

Again, this is not a case about the existence, or absence, of a vast government conspiracy.

It is a case about one agency's decision to withhold two documents that were responsive to plaintiff's FOIA request, based on a determination that the documents were exempt from FOIA pursuant to a statutory exemption covering pre-decisional agency drafts that include recommendations or opinions on legal or policy matters. Plaintiff has not set forth any specific allegation of misconduct in the creation of either document. Nor has he set forth any basis for a finding that the documents will shed light on the alleged governmental misconduct.

As a result, the Court finds that, even if there is a government-misconduct exception to the deliberative-process exemption under FOIA, plaintiff has not established any factual basis for the application of such an exception with respect to the specific documents at issue here.

### b. Requirement that Documents be Pre-Decisional

Plaintiff also appears to contend that the agency may not invoke exemption 5 because the documents were not pre-decisional. Although plaintiff's argument is confusing, he appears to contend that the documents cannot be considered pre-decisional because they were created after the video animation aired on CNN.

Plaintiff here is not the first person to seek the release of the documents in question under FOIA on this ground. Indeed, the District Court for the Central District of California denied an identical argument in *Lahr v. Nat'l Safety Transp. Bd.*, 2006 U.S. Dist. LEXIS 76170 (C.D. Cal. 2006); its decision was later upheld by the Ninth Circuit in *Lahr v. NTSB*, 569 F.3d 964 (9th Cir. 2009). There, the circuit court noted that "[c]ontrary to [plaintiff's] position, the fact that the CIA did not issue a subsequent report is, under the applicable case law, not dispositive of whether the records are 'predecisional.'" *Lahr*, 569 F.3d at 981. The court went on to review the records *in camera* before determining that the records were both pre-decisional and

deliberative for the purposes of the deliberative process privilege.

Plaintiff has not presented any new arguments here that would cause this Court to second-guess the determinations of two other federal courts. The Court finds that the records were deliberative and pre-decisional, and thus properly withheld under exemption 5.

Accordingly, the Court will grant defendant's motion for summary judgment as to the records withheld by defendant under exemption 5.

### 2. Documents Withheld Pursuant to Exemptions 6 and 7

Exemptions 6 and 7(c) both protect individual privacy interests by exempting certain types of information from public disclosure. Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(c) protects "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Under both exemptions, the court must balance an individual's interest in privacy against the public's interest in disclosure. *See, e.g., National Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004).

Defendant has provided plaintiff with several documents that discuss or recount eyewitness accounts of the crash gathered by FBI agents involved in the initial investigation. Prior to releasing the records, the agency redacted the names of both the FBI agents and the eyewitnesses they interviewed. It contends that the identifying information is protected under FOIA exemptions 6 and 7(c) because the individuals' interests in privacy outweigh the public's interest in the disclosure of their names.

To begin, it appears to the Court that the information sought by plaintiff is clearly the type of information that is addressed in exemption 7(c)—the eyewitness accounts are inarguably reports that were prepared for law enforcement purposes. Because "[e]xemption 7(c)'s privacy language is broader than the comparable language in [e]xemption 6 . . .", *Lahr*, 569 F.3d at 974 (citing *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989)), the Court need not determine whether the documents are also "personnel, medical, or similar files" under exemption 6. Rather, the Court will focus its analysis on the terms of exemption 7(c).

Plaintiff first contends that the Court should not allow defendant to invoke this exemption on the ground that the eyewitnesses did not have a valid privacy interest. He suggests that the names of eyewitnesses to crimes or accidents are regularly disclosed publicly through police reports and similar documents, and the eyewitnesses therefore had no expectation of confidentiality that warrants protection.

This argument is unavailing. The Supreme Court has repeatedly stated that the concept of personal privacy encompasses, at the very least, an individual's control of information about himself. *See Favish*, 541 U.S. 157, 165 (2004). Indeed, the Court has expressly addressed the privacy interests of an individual who is interviewed as a witness. In *Favish*, the Court stated that

> [l]aw enforcement documents obtained by [g]overnment investigators often contain information about persons interviewed as witnesses or initial suspects but whose link to the official inquiry may be the result of mere happenstance. There is special reason, therefore, to give protection to this intimate personal data, to which the public does not have a general right of access in the ordinary course. []
> In this class of cases where the subject of the documents 'is a private citizen,' 'the privacy interest . . . is at its apex.'

*Id.* at 166 (quoting *Reporters Comm.*, 489 U.S. at 780). That privacy interest is not conditioned on any promise or expectation of confidentiality. Thus, not only do the eyewitnesses whose names have been withheld have a valid privacy interest; that privacy interest is "at its apex."[1]

Next, plaintiff contends that there is a strong public interest in disclosure that outweighs any individual privacy interest that the witnesses retain. The Supreme Court has indicated that there is only one relevant public interest in the balancing analysis under FOIA exemption 7(c)—"the extent to which disclosure of the information sought would 'shed light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *United States Dep't of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 497 (1994) (quoting *Reporters Comm.*, 489 U.S. at 773). Plaintiff contends that "[r]eleasing the names of all witnesses to the crash would clearly serve the important interest of shedding light on the government's malfeasance, as it would serve to invite those witnesses to speak out, contrary to the admonitions given to some of them by federal agents, and thereby set the record straight by commenting on the accuracy of the CIA analysis." (Pl. Br. at 25).

The Ninth Circuit was faced with a virtually identical argument in *Lahr*, and squarely rejected that argument. The court cited its own determination in an earlier case, *Forest Service*

---

[1] Plaintiff argues that this privacy interest is undermined by evidence suggesting the FBI may have discouraged certain individuals from speaking publicly about what they saw. He contends that "the witnesses deserve an opportunity to speak out on their own behalf . . . ." However, there is no language in either the statute or the case law that suggests that an eyewitnesses' right to privacy should be balanced against a right to speak publicly, particularly where there is no evidence that the right to speak has truly been abridged.

The FBI interviewed more than one hundred eyewitnesses to the crash. Some of those individuals have chosen to come forward; others have chosen not to. While plaintiff has set forth one possible explanation for the decision not to come forward, there are easily a dozen other explanations for why an individual might choose not to come forward—including the very plausible possibility that an individual might not want to be contacted by the media or by persons such as plaintiff. The framers of FOIA intended to protect that choice. *See Reporters Comm.*, 489 U.S. at 765-66. ("[D]islosure of records regarding private citizens, identifiable by name, is not what the framers of the FOIA had in mind."). Plaintiff cannot overcome that protection simply by raising the possibility that some of the people who have not come forward might have had a desire to do so.

*Emp. for Envtl. Ethics v. U.S. Forest Service*, 524 F.3d 1021 (9th Cir. 2008), that "'[t]he only additional public benefit the release of the employees' personal information would provide'—the ability to contact witnesses . . . to obtain information not contained in the report—'was inextricably intertwined with the invasion of . . . privacy.'" *Lahr*, 569 F.3d at 979. The court thus reiterated its earlier holding that "when 'the only way the release of the identities' will benefit the public 'is if the public uses such information to contact [the witnesses] directly,' such use cannot justify release of the information." *Id*.

This Court finds the Ninth Circuit's analysis on this point persuasive. Plaintiff already has access to the content of the eyewitness reports that actually describes the substance of what the eyewitnesses saw. The only way the release of the names of the eyewitnesses could further advance the public interest of letting citizens "know what their government is up to" is if those eyewitnesses were contacted and asked to make further statements. Such contact is the exact invasion of privacy against which Exemption 7(c) is intended to protect. As such, it cannot justify the release of the information.[2]

Accordingly, the Court will grant defendant's motion for summary judgment as to the records withheld by defendant under exemptions 6 and 7(c).

---

[2] To the extent that plaintiff suggests that the release of the eyewitnesses' names will cause those persons to feel free to come forward and make public statements that they were previously discouraged from making, without any contact from plaintiff or others, such an argument is wholly unconvincing. Any eyewitness who continues to follow the details of the TWA Flight 800 saga with sufficient attention to be aware of any such ruling by this Court would certainly be aware by now of the many eyewitnesses who have spoken out without retribution, and would feel free to do the same. Any eyewitness who is not following the saga with such close attention would only find out about the release of their name when they were contacted, either by plaintiff or by the media, for further statement. There simply is no plausible scenario in which a decision by this Court to release an eyewitness's information results in an advancement of the relevant public interests without a concurrent violation of the individual privacy interests at stake.

### C. The Adequacy of Defendant's Search for Records

Finally, plaintiff contends that the defendant did not perform an adequate search for all documents within the scope of his FOIA request. This contention is based on an FBI press release from November 18, 1997, that referred to a photograph taken by an eyewitness on the night of the crash that appeared to depict a cylindrical object in the sky. According to plaintiff, the press release indicated that the photo was being analyzed by the CIA National Imagery and Mapping Administration. Neither the photo, nor any documents relating to it, were produced in response to plaintiff's FOIA request. Plaintiff thus suggests that defendant did not conduct a full and adequate search.

Under FOIA, an agency must conduct a search that is "reasonably calculated to discovery the requested documents." *Maynard v. CIA*, 986 F. 2d 547, 559 (1st Cir. 1993) (quoting *Safecard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)). To demonstrate compliance, an agency "may rely upon affidavits provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith." *Id*. Once such affidavits are produced, a presumption arises that the agency has acted in good faith, and a requester must "provide countervailing evidence as to the adequacy of the agency's search." *Duenas Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003).

Defendant has submitted a declaration by Robert R. Roland, the Information Review Officer for the CIA's Directorate of Intelligence. The declaration describes the structure of the agency, the nature of the search, and the methodology employed by the agency in order to locate documents that were responsive to plaintiff's requests. It indicates that the search involved both computerized searched of records systems and page-by-page review of hard copy files. (Roland Decl. ¶ 23). The agency did not simply rely on the documents that had been provided in

response to earlier requests, but also undertook additional record searches in response to plaintiff's clarifying letter. Based on the description set forth in the declaration, it appears that the agency is entitled to a presumption that it conducted the search in good faith.

Plaintiff's only evidence with which to rebut that presumption is the existence of a photograph that was not turned up by the search. However, a FOIA search is not required to be perfect; rather, it is required to be reasonable. *See Judicial Watch, Inc. v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003). Even if a search fails to locate a document that once existed, that failure does not in itself render the search inadequate. *Oleskey v. U.S. Dep't of Defense*, 658 F. Supp. 2d 288, 298 (D. Mass. 2009). Without more, plaintiff cannot overcome the presumption that defendant conducted the FOIA search in good faith.

Accordingly, the Court will grant defendant's motion for summary judgment as to the adequacy of its FOIA search.

**IV.     Conclusion**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

**So Ordered.**

                                                    /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
Dated: September 5, 2013                    United States District Judge